STATE ex rel. CALDWELL, Attorney General, et al., Plaintiffs, v. AMERICAN EXPRESS COMPANY et al., Defendants.

(161 N. W. 132.)

(File No. 4106.   Opinion filed January 20, 1917.)

1.   **Courts—Jurisdiction—Enjoining Intrastate Express Rates Prepared Under Federal Commission's Order—Jurisdiction of State Court—Statutes Construed.**

An action to enjoin an express company from putting into effect a schedule of intrastate express rates higher than those set by state railway board, pursuant to Laws 1911, Chap. 152, and intended to be enforced without giving the notice required by Laws 1913, Chap. 304, and which schedule was prepared in obedience to Interstate Commerce Commission's order to make no discriminating rates, and which schedule was based upon interstate rates between Sioux City, Iowa, and South Dakota territory, the enforcement of which rates would remove the discrimination complained of, but would result in as great, if not greater discrimination against commercial centers in South Dakota, named in such order, and in favor of all other points

in this state than that now existing against Sioux City and in favor of the five cities to which the new intrastate rates apply, was properly brought in the state court; since Act of Cong. Oct. 22, 1913, Chap. 32, 38 Stat. 219 (U. S. Comp. St. 1913, Sec. 994), requiring the venue of a suit "to enforce, suspend, or set aside * * * any order of the Interstate Commerce Commission" to be brought in federal court, is not applicable; since such action is not one to "suspend or set aside" the order of the commission, but is one to enjoin putting into effect such schedule, neither prepared nor approved by the commission, nor authorized by it, which schedule defendants seek to put into force in direct violation of the laws of this state. **Held,** further, that if the purported order of the commission does in any respect regulate intrastate commerce, it is to that extent void for want of the commission's jurisdiction over the subject matter.

2. **Commerce—Intrastate Rates—Removal of Discrimination—Unjust Discrimination as Involving Unreasonable Rates—Remedy for Discrimination—Authority to Remove Discrimination, How Measured.**

In a suit to enjoin the operation of a scedule of intrastate express rates, **held,** that any discrimination existing, either against carriers, shippers, or consumers, arising solely from charging reasonable rates, cannot be removed by a change of rates without there result an unjust discrimination against either carriers, shippers, or consumer; since behind unjust discrimination there always exists unreasonable—that is, unjust and unfair—rates; therefore the sole remedy for unjust discrimination lies in establishment of reasonable rates; and the authority to remove unjust discrimination is measured by the authority to prescribe reasonable rates, and every appeal to a commission seeking the termination of discrimination, is, in effect, a prayer for establishment of reasonable rates. Such appeal cannot be effective, unless made to those having authority to prescribe rates. So **held,** in determining whether the state court has jurisdiction to permanently enjoin said schedule of rates.

3. **Same—Jurisdiction—Intrastate Express Rates—Transportation "Wholly Within One State"—Discrimination Between Interstate and Intrastate Commerce—Jurisdiction of Interstate Commission to Prescribe Intrastate Express Rates—Federal Statute Construed.**

Under Interstate Commerce act Feb. 4, 1887, Chap. 104, Sec. 1, Par. 1, 24 Stat. 379 (U. S. Comp. St. 1913, Sec. 8563), providing that that act shall not apply to transportation, etc., "wholly within one state," the Interstate Commerce Commission was without jurisdiction to regulate and control intrastate

express rates, either for the purpose of preventing unjust discrimination between interstate and intrastate commerce between certain cities, one of which was within the state of Iowa and the others within this state, or for the purpose of preventing unreasonable preference; that the proviso in Sec. 1 of said act, in effect limits "the provisions of this act," so that no provision, whether found in Sec. 13, providing, among other things, against undue or unreasonable preference, etc., to any particular locality, and against rate discrimination, or elsewhere in said act, applies to transportation of passengers or property "wholly within one state."

4.  **Same—Intrastate Express Rates—Discrimination—Enforcement of Higher Rate—Intrastate Rates Concededly reasonable—Power of Federal Commission to Determine Reasonableness—Remedy, Before State Tribunals.**

In a suit to restrain enforcement of intrastate express rates, and to determine whether the state court, as against the Interstate Commerce Commission, has jurisdiction to enjoin such rates, held, that, unreasonable rates being the sole cause of unjust discrimination, and, it being conceded that the intrastate rates heretofore established by the state board of railway commissioners are reasonable, the Interstate Commerce Commission had no power under the Interstate Commerc Act to pass upon the question of reasonableness of the intrastate rates. Held, further, that if the intrastate rates so established were unreasonable, the law provides no relief therefrom except before the state board of railway commissioners, or in the courts.

5.  **Same—Intrastate Express Rates—Discrimnation—Power of Interstate Commission to Authorize Higher Rates—Submission of Proposed Schedule to State Board, Necessity—Statute—Commission's Order.**

Where Interstate Commerce Commission ordered defendant express company to cease "collecting higher rates, between Sioux City, Iowa, and points in the State of South Dakota," without designating such points, and without designating what territory was commercially tributory to the five South Dakota cities between which it was claimed that express rates existed which were discriminatory as against Sioux City, held, that the carrier was not authorized by said order to raise all intrastate rates between the named commercial centers of this state and every other part of the state to or from which shipments might be made, without submitting the proposed schedule to the state railway board, as required by Laws 1913, Chap. 304; in which event it would be for said board to prescribe the territory to which the new rates should apply. Held, further, that, construed as implying that in order to raise said rates, de-

fendants must apply to said state board for such authority, said order was valid.

**6.    Evidence—Interstate Commerce—Relation Between State Terri-tory and Outside Points—Judicial Notice of.**

In a suit to enjoin enforcement of intrastate express rates, involving the validity of an order of the Interstate Commerce Commission concerning alleged discrimination between a city outside of this state and cities within this state, held, that the Supreme Court will take judicial notice of the geography of this state, its lines of railroad, and the location of the several cities in question within this state; that the larger part of this state, while commercially tributary to some one or more of the five South Dakota cities, is not in any respect commercially tributary to Sioux City, and that some portions of this state are not commercially tributary either to any one of such five cities or to Sioux City.

**7.    Commerce—Discrimination—Intrastate Express Rates, Raising of—State Statute, Requiring Notice—Whether in Conflict With Authority of Interstate Commission.**

That part of Laws 1911, Chap. 207, Sec. 10, as amended by Laws 1913, Chap. 304, providing that no advance shall be made in established intrastate rates, etc., except after 30 days' notice to state railway board, and to the public, nor until allowance by said board, is a reasonable regulation wherein it provides for such notice, and should be sustained, as against the claim that the Interstate Commerce Commission may, by its order, authorize the express company to put into operation its proposed new rates; and such requirements as to filing and notice are not in conflict with, nor derogatory to the authority of said Commission, to prevent discriminating interstate rates, even if the provision requiring allowance by the board does so conflict.

Original proceedings by the State of South Dakota, on the relation of Clarence C. Caldwell, Attorney General, and the State Board of Railway Commissioners, to restrain the American Express Company and others from putting into effect a certain schedule of intrastate express rates. Judgment entered restraining defendants.

*C. C. Caldwell,* Attorney General, *P. W. Dougherty* and *Oliver E. Sweet,* Assistant Attorney General, for Plaintiffs.

*T. B. Harrison, Branch P. Kerfoot,* and *Bailey & Voorhees,* (*Charles W. Stockton,* of counsel) for defendants.

*E. E. Wagner,* and *T. H. Null,* amici curiæ.

(1) To point one of the opinion, Plaintiff cited: State Board of Railroad Commissioners' order of May 2, 1911, "ordering into effect" a schedule of reasonable maximum rates for the transportation of property by express between points within the state of South Dakota on the various lines of railroad in this state; Laws 1911, Chap. 207, Sec. 10; and submitted that: The present proceeding does not aim to vacate or set aside the order entered by the Interstate Commerce Commission in the Sioux City Express Rate case, 39 I. C. C. 703, nor to enjoin the enforcement of the said order.

Defendants cited: "An Act to Codify, Revise and Amend the Laws Relating to the Judiciary," approved March 3, 1911, (36 Stat. at L. pp. 1087-1168), Secs. 207, 208; "An Act Making Appropriations to Supply Urgent Deficiencies for the Fiscal Year 1913, and for Other Purposes," approved October 22, 1913, (38 Stat. at L. pp. 209-233).

(3) To point three of the opinion, Plaintiffs cited: Houston E. & W. T. R. Co. v. United States, 234 U. S. 342, 58 L. Ed. 1341, 34 Sup. Ct. Rep. 833; Gray and Zenter v. American Express Company, 44 W. R. C. Rep. 817.

Defendants cited: Interstate Commerce Act Feb. 4, 1887, Chap. 104, Secs. 1, 3, 24 St. 379; Railroad Commission of Louisiana v. St. Louis & Southwestern Railway Company, 23 I. C. C. Rep. 31; Shepard v. Northern Pacific Railway Company, 184 Fed. 765; The Minnesota Rate Cases, 230 U. S. 352; Texas & Pacific Railway Company v. United States, 205 Fed. 380; Houston & Texas Railway Company v. United States, 234 U. S. 342; Business Men's League of St. Louis v. Atchison, Topeka & Santa Fe Railway Company, 41 I. C. C. Rep. 13;; Merchants' Exchange of St. Louis v. B. & O. Railroad Company, 34 I. C. C. Rep. 341; The Missouri River-Nebraska Cases, 40 I. C. C. Rep. 201; Railroad Commission of Louisiana v. Arkansas Harber Terminal Railway Company, 41 I. C. C. Rep. 83.

(5) To point five of the opinion, Defendants cited: In re Express Rates, 24 I. C. C. Rep. 380; 28 I. C. C. Rep. 131; 35 I. C. C. Rep. 3.

(7) To point seven of the opinion, Plaintiffs cited: Laws 1911, Chap. 207, Sec. 10; Laws 1913, Chap. 304; Laws 1911, Chap. 152; Railroad Commission of Louisiana v. Arkansas

Harbor T. R. Co. et al., 41 I. C. C. 83; Minnesota Rate Cases, 230 U. S. 352, 57 L. Ed. 1511, 33 Sup. Ct. 729, 48 L. R. A. (N. S.) 1151; Railroad Commission Cases, Stone v. Farmers Loan & Trust Company, 116 U. S. 307, 334; Chicago & North Western Railway Company v. Fuller, 84 U. S. 560.

PER CURIAM. Plaintiffs seek to restrain defendants from putting into effect a certain schedule of rates governing charges for the transportation of express between Aberdeen, Mitchell, Sioux Falls, Watertown, and Yankton, commercial centers of this state, and all other cities and towns in the state. From the complaint, filed September 12, 1916, it appeared that the State Board of Railway Commissioners (hereinafter spoken of as the "Board") had theretofore, pursuant to statute (chapter 152, Laws 1911), established and put into effect a schedule of rates governing charges for the transportation of express between all points within this state, which schedule was still in full force and effect; that the statutes of this state (chapter 304, Laws 1913) provided that no advance should be made in rates so established except upon 30 days' notice to the Board and the public, and not until such advance had been allowed by the Board; and that defendant on August 25, 1916, had presented for filing with the Board, and announced its intention of putting into force on September 15, 1916, a certain rate schedule, being the schedule first above referred to. This proposed schedule applied to all interstate traffic to and from every point in this state; it also applied between all stations in this state, reached by the defendants, and the above five cities. The rates in the said schedule, in so far as they related to intrastate traffic, were materially higher than those named in the intrastate rates then in force. Upon such complaint, an order was issued restraining defendants from putting such schedule in force pending the final determination of this action. Defendants then answered admitting all the above facts, and alleging that their action in filing such schedule had been taken in obedience to an order of the Interstate Commerce Commission (hereinafter spoken of as the "Commission").

The following facts are conceded: A proceeding on behalf of the shippers of Sioux City, Iowa, and against these defendants, had been theretofore brought before the Commission by the

Traffic Bureau of the Sioux City Commercial Club.  See Traffic
Bureau v. Am. Express Co., 39 Interst. Com. Com'n R. 703.
In such proceeding, complaint was made that the rates charged
by defendants, upon express shipments from Sioux City to
"points in the state of South Dakota," being the interstate rates
that had been established by the Commission, were "unjust, un-
reasonable, and excessive in themselves and  *  *  *  in violation
of the act to regulate commerce  *  *  *"; that such rates were
very much higher than those from the South Dakota commercial
centers to points equally distant in said state; and that the charg-
ing of such rates from Sioux City is "unjustly discriminatory and
subjects  *  *  *  Sioux City as a jobbing center to undue and
unreasonable prejudice and disadvantage."  The plaintiff prayed
that action be taken to end such discrimination.  Defendants,
answering, admitted the existence of the alleged discrimination
complained of, but denied responsibility therefor, alleging that
the interstate rates charged by them were those established by the
Commission and that the intrastate rates so charged were those
established by the Board.  Defendants asked "that an order be
entered requiring the removal of this unjust discrimination by
applying to express shipments moving between *all points* in
South Dakota the rates found reasonable by this Commission" in
certain proceedings theretofore had before such Commission. The
Commission stated that, by the above request, "the defendants
seek to broaden the issues and bring before us for review the
relation of rates on other movements than those involved in the
complaint."  39 Interst. Com. Com'n R. 704.  Said proceeding
resulted in the making of the following findings by the Com-
mission:

"(1) That rates for the interstate transportation of shipments
by express between Sioux City, Iowa, and points in the state of
South Dakota heretofore prescribed by us as reasonable have not
been shown to be unreasonable.

"(2) That the defendants maintain higher interstate rates
between Sioux City and points in the state of South Dakota than
between Sioux Falls, Mitchell, Aberdeen, Watertown, and Yank-
ton, S. D., and points in the same state applicable to shipments
by express which are transported under substantially similar cir-
cumstances and conditions.

"(3) That thereby an undue preference is given to Sioux Falls, Mitchell, Aberdeen, Watertown, and Yankton, and an undue and unreasonable prejudice and disadvantage is effected against Sioux City.

"(4) That the defendants should cease and desist from continuing said undue preference and unjust discrimination."

Upon such findings the Commission entered the following order:

"It is ordered that the above-named defendants, according as they participate in the transportation, be, and they are hereby, notified and required to cease and desist, on or before August 15, 1916, and thereafter to abstain, from publishing, demanding, or collecting higher rates for the transportation of shipments by express between Sioux City, Iowa, and points in the state of South Dakota than are contemporaneously published, demanded, or collected for transportation under substantially similar circustances and conditions for substantially equal distances between Sioux Falls, Mitchell, Aberdeen, Watertown, and Yankton, S. D., on the one hand, and said points in the state of South Dakota on the other, which said relation of rates has been found by the Commission to be unjustly discriminatory. And *  *  *" 39 Interst. Com. Com'n R. 703.

The Commission made no order approving or adopting the schedule of rates filed by defendants with the Board, nor any order in any manner making such schedule its schedule, unless the order above quoted had that effect. The Commission failed to prescribe what "points" in South Dakota its order should apply to, nor did it make any finding as to what portion of the lines over which defendants did business were in territory *commercially tributary to Sioux Falls*. In its report, after again referring to the effort of defendants to broaden the issues, it says:

"We shall limit our findings to the allegations of unreasonableness and unjust discrimination found in the complaint."

The only statement made by the Commission in its report touching upon the question of what territory is commercially tributary to Sioux City is found under the heading, "Location of Sioux City with Reference to Sioux City Traffic," under which

heading the Commission, at page 706 of 39 Interst. Com. Com'n R., said:

"The southeastern section of South Dakota is thus a natural and important trade territory for Sioux City shippers whose principal competitors within the state are located at Sioux Falls, Mitchell, Aberdeen, and Watertown. Competition with dealers * * * at Yankton in the sale of ice cream is also shown."

[1] The rates named in the schedule filed with the Board were based upon the interstate rates between Sioux City and South Dakota territory, and their enforcement would remove the discrimination complained of; but it clearly appears that their enforcement would result in as great, if not a greater, discrimination against commercial centers of South Dakota named in such order and in favor of all other points in this state, than that now existing against Sioux City and in favor of the five cities to which the new intrastate rates apply.

Has this court jurisdiction to, and should it, permanently restrain defendants from putting such rates into force?

Defendants contend that this court has no jurisdiction of the subject-matter of this action, citing the provisions of Act of Congress October 22, 1913, 38 Stat. at L. p. 219 (U. S. Comp. St. 1913, § 994), that:

"The venue of any suit hereafter brought to enforce, suspend, or set aside, in whole or in part, any order of the Interstate Commerce Commission shall be in the [federal] judicial district. * * *"

There are two answers to this contention: (1) This is not an action to "suspend or set aside" the order of the Commission, but one to enjoin the putting into effect of a schedule of rates, neither prepared nor approved by the Commission and clearly not authorized by it, which schedule defendants are seeking to put into force in direct violation of the laws of this state. (2) If the purported order of the Commission does, in any respect, regulate intrastate commerce, it is to that extent void owing to the Commission's want of jurisdiction over the subject-matter.

[2, 3] Having jurisdiction to act, should we permanently restrain the establishment of the proposed rates? Paraphrasing the words of Judge Landis in a recent decision, C., B. & Q. Ry. Co. v. State Public Utilities Commission of Illinois:

"We had a lawfully established intrastate schedule of rates. Defendants contend that such schedule has been superseded by the order of the Commission. How can such intrastate rates be lawfully superseded? It may be done by the Board, acting for the state of South Dakota; or it may be done by Congress, acting through the Commission, if the superseding of such intrastate rates comes within the exercise of the power of Congress to regulate commerce between the states"

Defendants contend that the Commission has authority to regulate and control intrastate rates, in so far as such regulation and control may be necessary in order to prevent unjust discrimination resulting from inequalities between such rates and interstate rates. In support of the above contention, defendants cite the decision of the federal Supreme Court (hereinafter spoken of as the "Supreme Court") in the so-called Shreveport Case, 234 U. S. 342, 34 Sup. Ct. 833, 58 L. ed. 1341. Plaintiffs contend that the law applicable to the facts of this case was announced by the Supreme Court in the Minnesota Rate Cases (hereinafter spoken of as the "Minnesota" Case) 230 U. S. 352, 57 L. ed. 1511, 33 Sup. Ct. 729, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; and that the order of the Commission, if subject to the construction given it by defendants, is invalid in that the Commission was without authority over the subject-matter thereof.

All controversy as to the authority of the Commission to control intrastate rates in order to remove discrimination resolves itself down to a dispute as to the scope and effect of certain provisions of the Interstate Commerce Act, and, when we arrive at the proper construction of such provisions, we must of necessity reach the proper determination of the existence or nonexistence of such authority. There are certain propositions so axiomatic that they must be presumed to have been in the minds of Congress when enacting such act. Any discrimination that may exist, either against carriers, shippers, or consumers, arising solely from the charging of rates that are reasonable, cannot be removed by a change of rates without there result an unjust discrimination against either the carrier, the shipper, or consumer. Behind unjust discrimination there always exists unreasonable—that is, unjust and unfair—rates; therefore the sole remedy for

unjust discrimination lies in the establishment of reasonable rates. Unreasonable rates being the cause and unjust discrimination the effect, the authority to remove unjust discrimination is to be measured by the authority to prescribe reasonable rates. Every appeal to a commission seeking the termination of discrimination is, in effect, a prayer for the establishment of reasonable rates. Such an appeal cannot be effective unless made to those having authority to prescribe rates. If, under its power to regulate interstate commerce, Congress can and does even indirectly fix the rates to be charged for intrastate commerce, even though such control professes to be limited in its territorial application, it must from the very necessities of commercial intercourse and competition result in a conformity of all intrastate rates to those thus prescribed. In other words, there is no such thing as a limited regulation by Congress of the charges for intrastate commerce—wherever Congress steps in, the free action of the local authorities is throttled, as they must of necessity eliminate discrimination and can only do so by conforming all rates to those prescribed by the dominant power. Congress, by the specific provisions of section 1 of the said act, has declared it shall be unlawful for carriers to make, and it has prohibited them from making, unjust and unreasonable charges "for any service rendered or to be rendered in the transportation of * * * property * * * as aforesaid." The preceding provision of said section, to which the word "aforesaid" refers, clearly shows that the "transportation" contemplated is solely such as is purely interstate. This, it would seem, was made doubly certain by the proviso contained in the first paragraph of such section, which proviso is hereinafter quoted, and which proviso expressly refers to, and, it seems to us, clearly limits, every provision of the whole act. Certainly it cannot be presumed that Congress intended that the authority, given the Commission under section 15 of such act, to enforce the provisions of section 3 thereof and thus prevent unjust discriminations, was intended to extend beyond and to be inconsistent with the corresponding authority, given to such Commission by sections 1 and 15, to remove the cause of such discrimination. As throwing further light upon the intent of Congress in enacting such act, it is well to note the situation at the time of such enactment. At that time it was

fully settled by judicial decisions: (1) That the actual regulation of interstate commerce by Congress excluded state regulation thereof. (2) That the power to regulate internal commerce rests exclusively with the states. (3) That in matters pertaining to commerce, which matters are essentially national in their character and, for that reason, requiring national uniformity in regulation, failure of Congress to act does not allow of state control; while, in matters local in character though affecting interstate commerce, the power of the state is complete and unrestricted in absence of congressional action. Up to that time whatever attempt had been made to establish or regulate rates for transportation of either passengers or freight or to prevent discrimination in rate charges had been the work of the several states. The right of the states to legislate, so far as their legislation pertained to intrastate commerce, had been fully recognized by the federal courts. We know of no case, and we believe none can be cited, wherein the Supreme Court had, up to that time, held that, under the commerce clause of the federal Constitution, the power of Congress extended even to the indirect control of intrastate rates. It is true that, in numerous decisions, the federal control over the instrumentalities of commerce had been held to extend to instrumentalities having a situs local to a state if the same were used in connection with interstate commerce. But as has been well said:

"It may be asked, why may not Congress regulate intrastate rates, if it may require, as the Supreme Court has decided, the use of safety appliances on purely intrastate trains? The reason is that, while interstate and intrastate rates may be interdependent for enconomic or geographical reasons, this is not the same direct interdependence that necessarily exists between trains or cars operated over the same tracks. A rate is a charge for, not an instrument of, transportation."

By the act in question, Congress embarked into a new field of action. It enacted certain provisions declaring the policy that should govern those engaged in interstate commerce. It knew and fully recognized that it could not act directly in the fixing and adjusting of rates—that it could only exercise such power through the medium of some administrative body. But the Supreme Court concedes that Congress did not give to such admin-

istrative agency the power to directly regulate rates for intrastate traffic—a power upon which, as we have noted, should properly rest the power to remove discrimination where such discrimination can only be removed by a change in intrastate rates. The Supreme Court, in the Shreveport case, says that Congress "did not undertake to authorize the Commission to prescribe intrastate rates and thus to establish a unified control by the exercise of the rate-making power over both descriptions of traffic."

[2] We do not believe sound logic will permit of the conclusion that, while Congress did not authorize the Commission to directly prescribe intrastate rates and thus establish a unified control over both interstate and intrastate rates, it did intend to give it the power, under the guise of preventing unjust discriminations, to exercise exactly the same control. When we contemplate the inevitable result of giving to the Commission a dominant power over intrastate rates in even a limited territory, we must recognize that through the exercise of such power it must exert an indirect influence absolutely controlling the intrastate rates throughout the state. Therefore, in view of all the above, we do not believe that Congress intended to exert any other than the power which at that time was conceded by all to have been given to it by the Constitution; and, with all due respect to the Supreme Court, we are contrained to differ from it and hold that the proviso in section 1 of said act has the effect, just as it purports, of limiting "the provisions of this act," so that no provision, whether it be one found in section 3 or elsewhere, "shall apply to the transportation of passengers or property * * * wholly within one state * * *" We think any other construction does violence to the plain wording of such proviso.

The point upon which the Supreme Court, in the Shreveport case, distinguished that from the Minnesota case, was that, in the Minnesota case, Congress had not acted; that is, the Commission, through which Congress had undertaken to exert its power, had not made any finding of unjust discrimination and adjudged how it should be eliminated. Keeping in mind that, in the Shreveport case, the court, when speaking of the failure of Congress to act, had reference to such failure of the Commission, the agent of Congress, to act, we find much of the apparent con-

flict between the two opinions disappears.  But there yet remains that which we are unable to reconcile and which leads us to feel that the Supreme Court went further in the Shreveport case than precedent or any reasonable construction of the federal statute warrants.  We shall not refer further to that part of the opinion in the Minnesota case wherein the court discusses certain principles, the application of which supports the right of Congress to control the instrumentalities of intrastate commerce, and then says:

"These principles apply to the authority of the state to prescribe reasonable maximum rates for intrastate transportation."

Upon the above proposition taken as a premise, the court reaches the conclusion that, through the medium of the Commission, Congress has undertaken to exercise a regulatory power or control over the state's authority to prescribe maximum intrastate rates.  Even if we were to concede the premise, we do not believe the conclusion follows, but do believe that Congress has expressly refused to exercise any such control.

The proviso in section I of the Interstate Commerce Act reads:

"Provided, however, that the provisions of this act shall not apply to the transportation of passengers or property, or to the receiving, delivering, storage, or handling of property wholly within one state and not shipped to or from a foreign country from or to any state or territory as aforesaid."

It was this proviso which was in the mind of the Supreme Court when, in the Minnesota case, it said (the underscoring being ours):

"The question we have now before us, essentially, is whether after the passage of the interstate commerce act, and its amendment, *the state continued to possess the state-wide authority* which it formerly enjoyed *to prescribe reasonable rates for its exclusively internal traffic. * * ***

"Having regard to the terms of the federal statute, the familiar range of state action at the time it was enacted, the continued exercise of state authority in the same manner and to the same extent after its enactment, *and the decisions of this court recognizing and upholding this authority, we find no foun-*

*dation for the proposition that the act to regulate commerce con-
templated interference therewith.*

"*Congress did not undertake to say that the intrastate ra :
of interstate carriers should be reasonable, or to invest its admi · ·
istrative agency with authority to determine their reasonablenes.·.*
Neither by the original act nor by its amendment did Congres:·
seek to establish a unified control over interstate and intrastate
rates; *it did not set up a standard for intrastate rates, or prescribe,
or authorize the commission to prescribe, either. maximum or
minimum rates for intrastate traffic.* It cannot be supposed
that Congress sought to accomplish by indirection that which it
expressly disclaimed, or attempted to override the accustomed
authority of the states, without the provision of a substitute. On
the contrary, *the fixing of reasonable rates for intrastate trans-
portation was left where it had been found;* that is, with the
states and the agencies created by the states to deal with that
subject.   Missouri, P. R. Co. v. Larabee Flour Mills Co., 211
U. S. 612, 620, 621, 29 Sup. Ct. 214, 53 L. ed. 352, 359, 360.

"How clear was the purpose not to occupy the field thus left
to the exercise of state power is shown by the clause uniformly
inserted in the numerous acts passed by Congress to authorize
the construction of railways across the Indian territory.  * * *.

"The decisions of this court since the passage of the act to
legulate commerce have uniformly recognized that it was com-
petent for the state to fix such rates, applicable throughout its
territory.   If it be said that in the contests that have been
waged over state laws during the past twenty-five years, the,
question of interference with interstate commerce by the estab-
lishment of state-wide rates for intrastate traffic has seldom been
raised, this fact itself attests the common conception of the scope
of state authority.   And the decisions recognizing and defining
the state power *wholly refute the contention that the making of
such rates either constitutes a direct burden upon the interstate
commerce or is repugnant to the federal statute.*"

Would it have been possible for such court to have used
language by which it could have more clearly or specifically
denied that Congress had asserted any right to extend federal
authority over the field of intrastate commerce? And the above

16—Vol. 38, S. D.

words were used more than a year after the Commission made its report in the Shreveport case and subsequent to the date of the decision of the Commerce Court in such case.

In the Shreveport case, just as in the case before us, the question before the court was the right of the carrier to end an existing discrimination, arising through the existence of interstate rates that were higher than intrastate rates, by raising the intrastate rates. The rates under consideration in that case were "commodity" rates, while in this case they are "class" rates; but that fact is entirely immaterial. In that case, the Supreme Court said (the underscoring being ours):

"Here, the Commission expressly found that unjust discrimination existed under substantially similar conditions of transportation, and the inquiry is whether the Commission had power to correct it. *We are of the opinion that the limitation of the proviso in section 1 does not apply to a case of this sort.* The Commission was dealing with the relation of rates injuriously affecting, through an unreasonable discrimination, traffic that was interstate. The question was thus not simply one of transportation that was 'wholly within one state.' *These words of the proviso have appropriate reference to exclusively intrastate traffic, separately considered; to the regulation of domestic commerce, as such.* The powers conferred by the act are not thereby limited where interstate commerce itself is involved. This is plainly the case when the Commission finds that unjust discrimination against interstate trade arises from the relation of intrastate to interstate rates as maintained by a carrier subject to the act. Such a matter is one with which Congress alone is competent to deal, and, in view of the aim of the act and the comprehensive terms of the provisions against unjust discrimination, there is no ground for holding that the authority of Congress was unexercised, and that the subject was thus left without governmental regulation. It is urged that the practical construction of the statute has been the other way. But, in assailing the order, the appellants ask us to override the construction which has been given to the statute by the authority charged with its execution, and it cannot be said that the earlier action of the Commission was of such a controlling character as to preclude it from giving effect to the law. The Commission, having before it a plain case

of unreasonable discrimination on the part of interstate carriers against interstate trade, carefully examined the question of its authority, and decided that it had the power to make this remedial order. The Commerce Court sustained the authority of the Commission, and it is clear that we should not reverse the decree unless the law has been misapplied. This we cannot say; on the contrary, we are convinced that the authority of the Commission was adequate."

We confess our inability to harmonize the parts underscored with what we have quoted from the opinion in the Minnesota case. At one fell swoop the Supreme Court, if it shall not withdraw in some degree from the above, has absolutely destroyed the power of the states to prescribe maximum rates for intrastate traffic. It is idle to say that it would have power over all rates except those dictated by the Commission. As before noted, the prevention of discrimination would require it to conform its rates to those prescribed by the dominant power. We are not questioning but that it may be the part of wisdom for the states to give to the federal government such power, or, if it has already given it, then for Congress to so amend its enactments as to assume the exercise of such power; but it seems to us that the question of expediency has no proper place in the discussion of either the power possessed by Congress or the power exercised by that body. We are inclined to believe that the Supreme Court may have unconsciously been influenced by the fact that "the relation of intrastate to interstate rates" is "* * * a matter * * * with which Congress alone is competent to deal." We cannot believe that, because the Commission had "carefully examined the question of its authority and decided that it had the power to make this remedial order," the Supreme Court should have felt in any manner constrained to follow such holding. On the contrary, if there is any one thing established by experience, it is that courts should look with the utmost suspicion upon the holding of any person or body as to its own authority —they are prone to reach out and assume to themselves authority never intended to be granted them. We cannot refrain from quoting the following words of the Supreme Court in the Minnesota case (the underscoring being ours):

"If the situation has become such   *     *    *    that adequate regulation of    *    *    *   'interstate rates cannot be maintained without imposing requirements with respect to    *    *    *   intrastate rates which substantially affect the former, *it is for Congress to determine, within the limits of its constitutional authority over interstate commerce and its instruments, the measure of the regulation it should supply. It is the function of this court to interpret and apply the law already enacted, but not, under the guise of construction, to provide a more comprehensive scheme of regulation than Congress had decided upon."*

[4] While we are of the opinion that the language of the act to regulate commerce is so clear as to admit of little doubt of the legislative intent, and that therefore the question of expediency is entitled to little or no consideration, yet in view of the fact that the Supreme Court, in the Shreveport case, advances the thought that "Congress alone is competent to deal" with "the relation of intrastate and interstate rates," we feel justified in suggesting that there is another power that can be relied upon to prevent injustice. The federal courts, through their power to set aside rates unjust to the interstate carrier, have full control over the only thing that will ever result in *unjust* discrimination as between interstate and intrastate traffic—the fixing by the Commission or the Board of a rate that is unjust to the carrier. As before stated, unreasonable rates are the sole cause of *unjust* discrimination. The reasonableness, as intrastate rates, of the rates established by the Board, is unquestioned; it must stand absolutely conceded for the purposes of this case as it had to be conceded before the Commission. The commission had no power to pass on that question. Moreover, the record herein shows that defendants had sought to have the federal courts restrain the enforcement of such rates upon the ground that they were confiscatory and such relief had been refused. The intrastate rates being conceded to be reasonable as intrastate rates, there can be no *unjust* discrimination traceable thereto. If the intrastate rates were unreasonable, the law provides no relief therefrom except before the Board or in the courts. We believe that Congress fully realized the impropriety, even if it had the power so to do, of placing in the hands of a federal commission the authority to pass upon the reasonableness of intrastate rates as such, and that

it intentionally withheld such power from the Commission. We would quote with approval the following from the opinion of Commissioner McChord in the Shreveport case.

"The majority points out the chaotic conditions that will result if its view be not accepted. It avers that it will then be within the power of the carriers or of the states to make rates within a state which will so confine the commerce of its communities as to exclude on equal terms other communities. The adoption of the Constitution was an expression of the people's aim toward co-ordination, rather than conflict between the sovereignties in the discharge of their respective powers. If, as suggested, our dual plan of government has led to chaos rather than harmony in the regulation of commerce, surely the corrective power has not been lodged with this Commission; and, if not vested in the Congress, the final remedy is to be found, as said in Taylor v. Beckham, 178 U. S. 580 [20 Sup. Ct. 890, 1009, 44 L. ed. 1187], 'in the august tribunal of the people which is continually sitting.' But I apprehend that such a remedy will not be invoked until it has been more clearly demonstrated than has been done by the majority report that such conflict is real and not the result of misconception both of law and of fact. The Congress is able completely to regulate interstate transportation without the exercise of any control over transportation which lies wholly within a state; so, also, is this Commission, by the proper exercise of the powers which have been conferred. If the alleged preferential intrastate rates are reasonable, and if the transportation conditions from the interstate point to the common territory are similar, it follows that the interstate rates must be too high and should be reduced. But this is not because of discrimination; rather because of inherent unreasonableness. * * * If an unreasonably low intrastate rate be prescribed by a state commission, the order would not have to be obeyed." 23 Interst. Com. Com'n R. 59.

We feel confident that, upon further consideration of these most important questions, the Supreme Court will recede, if not from the position it took in the Minnesota case in regard to the extent of the federal authority over interstate commerce, at least from the position it took in the Shreveport case in regard to the proper construction to be given to the act to regulate commerce.

Moved by such confidence, we deem it our duty to hold the order of the Commission, if subject to the construction given it by defendants, to be absolutely void owing to lack of authority in the Commission to make any such an order. If, however, this case shall reach the Supreme Court and it shall adhere to its decisions in the Minnesota and Shreveport cases, we shall cheerfully bow to its supreme authority and abide thereby.

[5] We come now to another question of supreme importance. Conceding that the Commission had full authority to make the order involved in this case, and that, under such order, the defendants were authorized to raise rates for intrastate traffic, it does not follow that they had authority to raise such rates between the five named commercial centers of this state and every other nook and corner of the state. Certainly Congress, in making the Commission its agency for the performance of certain administrative duties, never granted to it the authority to vest in the carriers the power to prescribe the territory to which one of its orders should apply. In the Shreveport case, the Commission fixed the maximum rates and expressly prescribed the territory to which the order should apply—in the case of two of the carriers, to their lines between Houston and Shreveport; in the case of the other carrier, to its line between Dallas and Shreveport. In the present case, the order was that the defendants were to cease "collecting higher rates * * * between Sioux City, Iowa, and points in the state of South Dakota. * * *" Such order was too indefinite to support any action by the defendants. The Commission could not leave with them the selection of the "points" to which the order should apply. It was incumbent upon defendants to get a sufficient order, one that, if valid, would support the entire schedule of rates which they sought to put into force. In the proceeding before the Commission, the relief sought was the putting of an end to unjust discrimination against Sioux City and in favor of the five South Dakota cities. Such unjust discrimination, if it existed, must of the very necessity be confined to such territory as was commercially tributary, not only to the five South Dakota cities, but especially to Sioux City. The Commission made no finding as to what territory was commercially tributary to Sioux City. It did state in the body of its report that:

"The southeastern section of South Dakota is thus a natural and important trade territory for Sioux City shippers."

[6] This court will take judicial notice of the geography of this state, its lines of railway, the location of these several cities. It will also take judicial notice that the larger part of this state, while commercially tributary to some one or more of the five South Dakota cities named, is not, in any respect, commercially tributary to Sioux City; furthermore, that some portions of this state are not commercially tributary either to any one of such five cities or to Sioux City. Under such circumstances, we certainly would be remiss in our duty if we allowed the proposed schedules to be put into force. Again paraphasing the words of Judge Landis in the case of C., B. & Q. Ry. Co. v. State Public Utilities Commission of Illinois:

"Now, what has the traffic official done when he chose to raise the South Dakota rates to the level of the interstate rates? He looked carefully over this order of the Commission, and he found that such order did not prescribe the territory to which it was to apply and he believed that he need not limit himself to the relief of Sioux City, but that he could substitute the interstate rate between the five South Dakota cities and all intra-South Dakota points. It is true, defendants may call it relieving Sioux City, but, in no place outside of a courtroom, would any man be heard to assert that, when you require a shipper to pay an increased rate for shipping express from Watertown, S. D., to South Shore, Florence, or Altamont, or from Aberdeen to Lemmon, Ordway, or Milbank, or from any one of the five South Dakota cities named to Edgemont, you are relieving Sioux City of a discrimination. What you are doing is relieving the defendants from the carrying of goods at a rate that, for the purposes of this case, must be presumed to be fair and just to the defendants, the shipper, and the ultimate consumer."

One might as well claim that Chicago should have the right to require the railroads of the Empire State to adjust their intrastate rates to the interstate rates so as to remove discrimination existing against Chicago and in favor of New York City in commerce with the northeast corner of the Empire State.

Is it not possible that defendants have placed upon the words of the order a construction not intended by the Commis-

sion? The Commission did not order that the discrimination be removed by an increase of intrastate rates. True, it intimated in its report that such method of removing the discrimination would be justified by the facts. Why then did the Commission so word its order as to leave it optional with the defendants, and why did it omit to prescribe the territory to which its order should apply? May we not fairly presume that it was because the Commission realized that, in order to raise the intrastate rates, the defendants would be under the necessity of applying for authority to the Board or of establishing in court the unreasonableness of the intrastate rates, and that, if the Board or courts granted relief, it would be for them to prescribe the territory to which the new rates should apply? So construed, the validity of the order is beyond question.

[7] Another question is presented by the record herein, which, though subordinate to the ones already discussed, is important as affecting the outcome of the present action. By section 10, c. 207, Laws 1911, as amended by chapter 304, Laws 1913, no advance in intrastate rates may be made except after 30 days' notice to the Board by filing of schedules, and to the public by publication and posting in every office of the carrier in the state. Said act also provides that no change in rates shall go into effect until allowed by the Board. It is clear that, if the Commission has the authority claimed for it by defendants, the latter requirement could be disregarded; but it would seem that the requirement of notice to the Board and publication would be such a reasonable regulation as should be sustained. The order in question was made on May 23, 1916; it was by its terms to become effective August 15, 1916; ample time was thus given to the defendants to file their schedules and make the publications required by such statute. Such requirements as to filing and notice are not in conflict with, nor derogatory to, the authority of the Commission. It is reasonable and just that defendants' patrons in South Dakota and the Board should be given 30 days' notice of an intention on the part of carriers to put into effect rates which so vitally affect transportation, and especially transportation that is purely intrastate.

Plaintiffs are entitled to a judgment granting the relief prayed for and for costs.