ABILENE & S. RY. CO. et al. v. STATE et al.
(No. 5820.)

(Court of Civil Appeals of Texas.   April 12,
1917.   On Motion for Rehearing, Jan. 9,
1918.   On Second Petition for Rehearing,
Jan. 16, 1918.)

1. COMMERCE ⟐⟐92—INJUNCTION AGAINST IN-
TERSTATE COMMERCE COMMISSION ORDERS—
JURISDICTION — "ENJOINING ORDER OF THE
INTERSTATE COMMERCE COMMISSION."
   Injunction proceedings by state to compel
a railway company chartered by such state to
obey orders of the state Railroad Commission
which had not been declared void by any court
and to restrain it from adopting a schedule of
intrastate rates prepared in compliance with
orders of Interstate Commerce Commission was
properly brought in a state court, Judicial Code
(Act Cong. March 3, 1911, c. 231. 36 Stat. 1148,
1149 [U. S. Comp. St. 1916, §§ 993, 997]) §§
207, 208, not applying, such a proceeding not
being a "suit to enjoin, set aside, annul or sus-
pend any order of the Interstate Commerce
Commission," which is required by such sec-
tions to be brought in a federal court, which
court shall have exclusive jurisdiction.

2. COURTS ⟐⟐493(2)—COMITY BY THE FEDER-
AL AND STATE COURTS.
   Where the parties to injunction proceedings
against charging by railway company of intra-
state rates in excess of those approved by state
Railroad Commission were different from par-
ties in suit pending in federal court involving
the same subject-matter, the doctrine regarding
comity existing between such courts was inap-
plicable.

3. COMMERCE ⟐⟐85 — POWER OF INTERSTATE
COMMERCE COMMISSION—INTRASTATE COM-
MERCE.
   Under Interstate Commerce Act Feb. 4,
1887, c. 104, §§ 1, 3, 24 Stat. 379, 380 (U. S.
Comp. St. 1916, §§ 8563, 8565), providing that
such act shall not apply to transportation, etc.,
"wholly within one state," the Interstate Com-
merce Commission had no jurisdiction to regu-
late intrastate commerce and rates for inter-
state carriers, although such rates had an in-
jurious effect upon interstate commerce; the
evident intention of Congress being to except
from the operation of the statute every phase of
interstate commerce, and such inhibition was
not limited merely to intrastate traffic when
considered separate and apart from other traffic.

4. STATUTES ⟐⟐181(1) — CONSTRUCTION—JU-
DICIAL POWER.
   In the construction of statutory law courts
are limited to the ascertainment of the legis-
lative intent, and when the language is plain
and the meaning not utterly absurd or unrea-
sonable, the courts do not concern themselves
with the wisdom or lack of wisdom of the law.

On Second Petition for Rehearing.

5. APPEAL AND ERROR ⟐⟐847(1) — ORDER
GRANTING INJUNCTION — EXTENT OF RE-
VIEW.
   Rev. St. 1911, arts. 4644 and 4645, author-
izing and regulating appeals from orders grant-
ing temporary writs of injunction, limits the
power and jurisdiction of the Court of Civil
Appeals to a consideration of the questions pre-
sented by the bill and answer and such evidence
as may have been heard by the trial judge.

6. APPEAL AND ERROR ⟐⟐1195(3)— SECOND
MOTION TO DISSOLVE.
   The decision of the Court of Civil Appeals
affirming the action of the trial court in grant-
ing a temporary injunction does not preclude
the trial court from considering a second motion
to dissolve.

Appeal from District Court, Travis Coun-
ty; George Calhoun, Judge.

Petition for injunction by the State of
Texas and others against the Abilene &
Southern Railway Company and others.
Writ issued, and defendants appeal.   Af-
firmed.

Hiram Glass, of Austin, J. W. Terry and
W. T. Armstrong, both of Galveston, E. B.
Perkins, A. H. McKnight and R. S. Shapard,
all of Dallas, H. M. Garwood, of Houston,
R. H. Ward, of San Antonio, R. E. Minton,
of Groveton, and A. Winslow, of Laredo, for
appellants.   B. F. Looney, Atty. Gen., and
Luther Nickels, C. A. Sweeton, and C. M.
Cureton, Asst. Attys. Gen., for appellees.

KEY, C. J.   We copy from appellants'
brief the following statement of the nature
and result of this suit:

   "On the 14th day of October, A. D. 1916, the
state of Texas, through her Attorney General,
filed a petition in the district court of Travis
county alleging that the appellants in open de-
fiance of law had publicly announced that on
and after November 1, 1916, they would com-
pletely ignore all rates, rules, and regulations,
of the Railroad Commission of Texas, and from
and after said date apply for the movement of
intrastate traffic higher and different rates and
different and more burdensome regulations for
the transportation of intrastate commerce than
provided by the Railroad Commission of this
state, and that they had, in connection with oth-
er roads, prepared and filed what is known as
Texas Lines Tariff No. 2B, naming joint and
proportional freight rates on classes and com-
modities moving between points in Texas, and
praying for a temporary injunction to restrain
appellants from charging other than the Texas
Commission rates or applying other than the
Texas Commission classification.

   "The state's petition does not disclose why
appellants were proposing to apply the rates
named in Texas Lines Tariff 2B, although the
reasons therefor had long theretofore been
known by the state and Attorney General.

   "The appellants filed a verified answer giving
a brief history of the proceedings before the In-
terstate Commerce Commission commenced in
1911 by the Railroad Commission of Louisiana
against the Houston East & West Texas Rail-
way Company and the Texas & Pacific Rail-
way Company, in which, after hearing had, the
Interstate Commerce Commission made its or-
der finding that the rates on said railroads from
Dallas and Houston to points in Texas in the
direction of Shreveport were lower than the
rates from Houston into Texas for equal dis-
tances, and therefore discriminatory against
Shreveport, and directed that said railways re-
move the discrimination.   The two roads named
made, published, and filed with the Interstate
Commerce Commission class rates in obedience
to the order, but contested the same as to com-
modity rates.   The Supreme Court of the Unit-
ed States on June 8, 1914, in Houston East
& West Texas Railway Co. v. United States,
234 U. S. 342, 34 Sup. Ct. 833, 58 L. Ed. 1341,
sustained the order of the Interstate Commerce
Commission in its application to commodity
rates also, and thereupon commodity rates were
duly made, published, and filed in obedience to
it.   Later the Railroad Commission of Louisi-
ana filed a supplemental petition making other
railroad companies parties defendants upon
which, after a hearing an order was made by
the Interstate Commerce Commission, requiring
the defendants in that proceeding to remove and

⟐⟐For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

discontinue the discrimination against Shreveport, in what was termed the Eastern district of Texas, being all of that portion of the state east of a line drawn from the Red river south through Gainesville, Ft. Worth, Waco, and down the Brazos river to the Gulf.

"The order as prayed for was granted, but before the same became effective, upon application of the Galveston Commercial Association, represented by H. H. Haines and other commercial organizations, corporations, and individuals doing business in Texas who were not parties, procured a suspension of the order before it became effective, and it was never complied with.

"That in October, 1915, the Railroad Commission of Louisiana filed a third complaint, in which it sought to have the requirements of the order or orders theretofore made by the Interstate Commerce Commission extended to all of the railroads in Texas, including these appellants who were parties defendant to that proceeding; that a hearing was had in December, 1915, at Houston, at which time additional evidence was offered, and thereafter, on April 12, 1916, the cause was duly submitted and argued, and the Interstate Commerce Commission, on the 7th day of July, 1916, rendered its decision and entered its order, the same being made a part of the answer in this cause; that in said report and order it was found that various of the rates theretofore charged on shipments moving between Texas points and Shreveport were unduly discriminatory against shippers and consignees doing business in Shreveport, La., as compared with the rates contemporaneously charged for similar shipments and distances between points in Texas; that, in order to remove said discrimination, the Interstate Commerce Commission, by said order and report fixed a tariff of class rates and various tariffs of commodity rates, which rates were found by the Interstate Commerce Commission to be just and reasonable, and it ordered the appellants and the other defendants thereto to publish and file with the Interstate Commerce Commission, to become effective November 1, 1916, a tariff of class rates and of commodity rates, not higher than those so fixed in said order and found by the Interstate Commerce Commission to be just and reasonable, and to thereafter apply such rates so published to shipments moving between Shreveport and points in the state of Texas, and to thereafter charge the same rates on similar shipments moving between points in the state of Texas for equal distances.

"That the appellants and each of them were parties to and were named in said order of the Interstate Commerce Commission of July 7, 1916, and were required to comply with and are authorized to act under said order of the Interstate Commerce Commission; that, acting under the requirements and under the authority of said report and orders of the Interstate Commerce Commission dated July 7, 1916, these defendants and other railway companies, acting each for themselves, caused to be prepared a tariff of rates styled 'Texas Lines Tariff 2B, I. C. C. No. 33,' naming local, joint, and proportional freight rates on classes and commodities applying between Texas points named therein on local Texas traffic, and also on interstate traffic moving between Shreveport, Louisiana, and points in Texas. A copy of said Texas Lines Tariff 2B was made a part of the answer.

"It is further alleged that by the terms of said order of the Interstate Commerce Commission dated July 7, 1916, the appellants are required to cease and desist on or before November 1, 1916, and thereafter to abstain from publishing, demanding, or collecting for transportation of property between Shreveport and points in Texas any higher class rate or rates on named commodities in carloads than are contemporaneously applied for the transportation of like property for like distances between points in Texas, except in these instances where the rates between points in Texas have been depressed by reason of water competition, and by said order of the Interstate Commerce Commission these appellants are required to establish on or before November 1, 1916, and thereafter to maintain and apply to the transportation of property between Shreveport, Louisiana, and points in Texas, class rates and rates on named commodities not in excess of those contemporaneously applied by them for the transportation of like property for like distances between points in the state of Texas.

"Appellants further allege that in said Texas Lines Tariff No. 2B, which, in obedience to the order of the Interstate Commerce Commission, was filed with that commission prior to September 30, 1916, they have inserted and published the rates found to be just and reasonable by the Interstate Commerce Commission for the movement of traffic between Shreveport and points in Texas, and have named the same rates for the movement of the same kind of traffic between points in Texas for the same distances. Appellants alleged that whether the said Texas Lines Tariff 2B filed with the Interstate Commerce Commission is or is not in any respect such as required by the order of the Interstate Commerce Commission of July 7, 1916, is a question over which the Interstate Commerce Commission in the first instance has sole and exclusive jurisdiction, and that the state of Texas, through her Attorney General, has invoked and submitted to the jurisdiction of the Interstate Commerce Commission by asking that commission to suspend its said order and the effective date thereof.

"That under the terms of said order of the Interstate Commerce Commission of July 7, 1916, these defendants are required on and after November 1, 1916, to charge for the transportation of the classes and commodities thereinbefore described between points in Texas the same rates which they charge for the same distances between Shreveport and points in Texas, and that under the terms of said act to regulate commerce and acts amendatory and supplemental thereto these defendants are required on and after November 1, 1916, to charge for transportation between Shreveport and points in Texas the rates prescribed and provided for in said Texas Lines Tariff No. 2B, and therefore they are required by said order of the Interstate Commerce Commission of July 7, 1916, to charge the very same rates for the same distances on classes and commodities when moving between points in the state of Texas.

"That the temporary injunction prayed for by the state, if granted, will necessarily suspend and restrain the operation of, and execution of, so much of the order of the Interstate Commerce Commission of July 7, 1916, as requires the appellants to charge on classes and commodities therein described moving between points in the state of Texas the same rates for the same distances as are published in said Tariff 2B to be charged on shipments moving between Shreveport and points in the state of Texas, and hence that the district court is wholly without jurisdiction to grant the injunction asked by the plaintiff therein.

"The appellants are bound under heavy penalties named in the Interstate Commerce Act to obey the orders of the Interstate Commerce Commission. Appellants further allege and show that the act of Congress creating a Commerce Court provided a remedy for suspending or restraining the operation and execution of an order of the Interstate Commerce Commission by any person aggrieved by such order by its filing suit in such Commerce Court against the United States of America; that by the act of Congress of the United States of October 22, 1913, the Commerce Court was abolished, and all the jurisdiction vested in said court was by

said act transferred to and vested in the several District Courts of the United States. It was further provided in said act of Congress that: 'The venue of any suit hereafter brought to enforce, suspend or set aside, in whole or in part, any order of the Interstate Commerce Commission shall be in the judicial district wherein is the residence of the parties or any of the parties upon whose petition the order was made.'

"The appellants alleged that the order of the Interstate Commerce Commission of July 7, 1916, was made upon the petition of the Railroad Commission of Louisiana, and that the residence of said Louisiana Commission is in the Eastern District of Louisiana.

"Said act further provides that no interlocutory injunction suspending or restraining the enforcement, operation, or execution of, or setting aside, in whole or in part, any order made or entered by the Interstate Commerce Commission, shall be issued or granted by any District Court of the United States or by any judge thereof, or by any circuit judge acting as district judge, unless the application for the same shall be presented to a circuit or district judge, and shall be heard and determined by three judges, of whom at least one shall be a circuit judge, and unless a majority of said three judges shall concur in granting such application. When such application as aforesaid is presented to a judge, he shall immediately call to his assistance to hear and determine the application two other judges. Said application shall not be heard or determined before at least three days' notice of hearing has been given to the Interstate Commerce Commission, to the Attorney General of the United States and to such other persons as may be defendants in the suit.

"Appellants urge that, Congress having provided a remedy to restrain the enforcement or operation of an order of the Interstate Commerce Commission, and having provided in what court such remedy may be pursued, that that remedy and court is exclusive, and that therefore no state court has the jurisdiction, power, or authority to suspend or restrain the operation or execution of an order of the Interstate Commerce Commission, and that the direct effect of granting a temporary injunction in this case would be to suspend and restrain the operation and execution of said order of the Interstate Commerce Commission.

"It was further alleged that the subject-matter of this suit was then pending in a court of the United States, same being the District Court for the Western District of Texas; that various railroads of Texas, not these appellants, filed their bill in the United States District Court for the Western District of Texas after having procured an order from Hon. Don A. Pardee, circuit judge of the circuit in which Texas is situated, praying for a temporary injunction to restrain the Railroad Commission of Texas, the Attorney General of Texas, and various shippers from interfering with the plaintiffs in that suit obeying and executing said order of the Interstate Commerce Commission, and that the Attorney General and Railroad Commission of Texas have filed their answer in said suit in the federal court making the Interstate Commerce Commission and the United States parties, and seeking to set aside, suspend, and restrain the operation and execution of said order of the Interstate Commerce Commission of July 7, 1916, and that said hearing for a temporary injunction will be held at Ft. Worth on November 8, 1916, and that therefore the United States District Court for the Western District of Texas having acquired jurisdiction of the subject-matter involved in this case, that in accordance with the comity among courts, that the District Court should not assume jurisdiction of any part of the same controversy, nor make any order therein before said hearing at Ft. Worth on November 8th.

"The defendants further answered, setting up all of the foregoing, and alleging that the prayer for injunction was without equity, because the effect would be to increase freight charges on interline shipments as more fully set out in said answer and to install two systems of rates applying in the same sections of the state, which would create chaos and confusion of rates to the detriment of both the railway lines and the shippers.

"Thereafter, on the 19th day of October, 1916, the hearing of the application of the state for a temporary injunction was begun before Hon. Geo. C. Calhoun, district judge of the Fifty-Third judicial district of Texas, in Travis county.

"The allegations in defendants' answer as to the matters affecting the jurisdiction of the district court were all sustained by documentary evidence submitted and were not contradicted or even denied by the state.

"There was some evidence as to the mode pursued in framing Texas Lines Tariff 2B and as to the effect that the granting of the injunction prayed for would have upon rates and upon the interests of the appellants.

"The court took the matter under advisement, and thereafter, on October 23, 1916, granted the temporary injunction prayed for, enjoining these appellants and all of them, pending the final hearing of said cause, and the further orders of said court, from applying, charging, demanding, or collecting any rate or rates for intrastate freight shipments between points in Texas than are or may be prescribed or authorized by the orders of the Railroad Commission of Texas, and from applying any classification other than that provided by the Railroad Commission of Texas.

"The order of the Interstate Commerce Commission requires appellants on and after November 1, 1916, on the movement of all traffic between points in Texas, to apply the current western classification in effect at the time such movement takes place. The Railroad Commission of Texas requires the application of Texas classification, which has the effect of producing lower rates.

"Appellants, while not believing that a motion for a new trial was necessary, nevertheless filed a motion, which was by the court overruled.

"The court in its original order, as well as in its order overruling the motion for a new trial, fixed the costs bond to be given on appeal at the sum of $2,000. Appellants gave notice of appeal to the Court of Civil Appeals, and filed its said bond for costs in the sum of $2,000, conditioned and payable as the law requires, and filed the transcript and record in this court on October 28, 1916, thus bringing all the issues in said cause before this court for revision and correction on assignments of error filed by appellants, which assignments of error present the same issues and grounds for reversal as presented in the motion for a new trial."

## Opinion.

[1] By appellants' first assignment of error, and propositions, statement, and argument thereunder, it is strenuously insisted that the court below was without jurisdiction, and that the suit should have been brought in a federal court. In support of that contention sections 207 and 208 of the Judicial Code of the United States and decisions construing those sections are cited and relied upon in behalf of appellants. The two sections referred to provide, in substance, that suits to enjoin, set aside, annul, or suspend any order of the Interstate Commerce Commission shall be brought in a federal court and against the United States, and

that such court shall have exclusive jurisdiction.

We cannot sanction the contention that the statute and decisions' referred to have application to the instant case. This is not a suit to set aside, enjoin, suspend, or annul any order made by the Interstate Commerce Commission, but is an action by the state to compel corporations chartered by it to obey the orders, classifications, and regulations of the Railroad Commission of the state, none of which have been declared void by any court. It is true that appellants have pleaded, both as a plea in abatement and in justification, an order of the Interstate Commerce Commission, which appellants claim justifies them in disobeying the orders of the Railroad Commission of Texas, but the fact that appellants have interposed such pleas does not render the state's suit an action to enjoin, set aside, annul, or suspend the order of the Interstate Commerce Commission.

In reply to the plea referred to the state contends that the order of the Interstate Commerce Commission is absolutely void, and that no necessity exists for going into a federal court and asking that it be set aside, annulled, or suspended. But that contention does not change the nature or character of the suit. Hence we hold that the trial court had jurisdiction to hear and determine the case, and therefore the first assignment of error is overruled.

[2] Under another assignment of error it is contended on behalf of appellants that the trial court committed error in refusing to respect the comity that ought to exist between the courts of the United States and the state courts; it being shown that when this action was commenced a suit was already pending in the District Court of the Western District of Texas involving substantially the same subject-matter, and in which other carriers but not these appellants, were plaintiffs, and the Railroad Commission and the Attorney General of Texas were defendants. The state of Texas and the appellants in this case are not parties to that suit, and therefore the litigation is not between the same parties, and the assignment presenting that question is overruled.

This brings us to a consideration of the controlling questions in the case, presented under the second, third, and sixth assignments, which read as follows:

• "Second. The court erred in granting the temporary injunction in this case because the evidence shows without contradiction that on July 7, 1916, in the above-styled cause, before the Interstate Commerce Commission, that commission issued its order prescribing just and reasonable rates between Shreveport and points in Texas, and ordered that on and after November 1, 1916, these defendants should not charge for the transportation of property between Shreveport and points in Texas class or commodity rates in excess of the rates found in said order to be just and reasonable, and said commission further ordered that the railroads should not con-

199 S.W.—56

temporaneously charge more for the transportation of property between Shreveport and points in Texas than they contemporaneously charge for the transportation of like property between points in Texas for like distances. Said order further provides that on and after November 1, 1916, these defendants and all the other railroads in Texas should in the transportation of property and the application of rates therefor apply the current Western classification, and, further, that these defendants, in conjunction with the other railroad companies of Texas, have prepared Texas Lines Tariff 2B, and filed the same with the Interstate Commerce Commission prior to September 30, 1916, and that in said tariff the defendants have provided for the application of the maximum rates found by the Interstate Commerce Commission in its said order of July 7, 1916, to be just and reasonable, for the transportation of property between Shreveport and points in Texas, and for the purpose of removing the discrimination found to exist by said Interstate Commerce Commission, and in compliance with its said order these defendants have provided in said Texas Lines Tariff 2B the same rates for application for like distances between points in Texas; that under the Constitution and laws of the United States these defendants have the right and the privilege and are under the duty of applying on and after November 1, 1916, the same rates named and provided for in Texas Lines Tariff No. 2B.

"Third. The defendants' answer and the undisputed evidence introduced on the hearing of the plaintiff's application for a temporary injunction shows that in a proceeding before the Interstate Commerce Commission, in the case of the Railroad Commission of Louisiana against all the defendants herein as well as all other railroads in Texas, the Interstate Commerce Commission on July 7, 1916, found that the rates established by the Railroad Commission of Texas and applied to the movement of the freight between points in Texas were discriminatory against Shreveport, La., in that said rates were much lower than the interstate rates from Shreveport, La., to points in Texas on similar traffic and for like distances; that in said proceeding the Interstate Commerce Commission, having jurisdiction over the subject-matter and over all these defendants as well as all other railroads in Texas, parties defendants to that proceeding, found and established just and reasonable maximum rates, both class and commodity, for application between Shreveport and points in Texas, and made its order that on and after November 1, 1916, these defendants shall not charge more than the maximum class and commodity rates so found by the Interstate Commerce Commission to be just and reasonable between Shreveport, La., and points in Texas, and further ordered that these defendants, and the other railroads of Texas, shall not charge higher class or commodity rates for the transportation of property between Shreveport, La., and points in Texas than those contemporaneously applied for the transportation of like property for like distances between points in the state of Texas, except in those instances in which the rates between Texas points have been depressed by reason of water competition along the Gulf of Mexico or waters contiguous thereto, and said order does not affect the rates on cotton or lumber; the said order required these defendants and all other railroads in Texas to file a tariff of rates as required by said order not less than 30 days prior to November 1, 1916; that in obedience to said order these defendants, in conjunction with the other railroads of Texas, prepared Texas Lines Tariff 2B, described in plaintiffs' petition, and filed the same with the Interstate Commerce Commission prior to September 30, 1916; that in said Texas Lines Tariff 2B defendants prescribed and named the maximum rates found by the Interstate Commerce Commission to be just and reasonable for application between Shreveport, La., and points in

Texas to be charged for the transportation of property between Shreveport, La., and points in Texas on and after November 1, 1916, and in said tariff the rates prescribed and established, class and commodity, to be applied by them for the transportation of like property for like distances between points in Texas, are the same rates named in Texas Lines Tariff 2B for the transportation of property between Shreveport, La., and points in Texas, and are the same rates found by the Interstate Commerce Commission to be just and reasonable for the movement of property between Shreveport, La., and points in Texas; that the Interstate Commerce Commission had the authority and power to compel these defendants and all other railroads in Texas to remove the discrimination found to exist against Shreveport, La., as aforesaid, and these defendants have the legal right to prescribe the maximum rates found by the Interstate Commerce Commission to be just and reasonable for the transportation of property between Shreveport, La., and points in Texas, and had and have the legal right to comply with the said order of the Interstate Commerce Commission to remove the discrimination against Shreveport, La., by elevating the Texas intrastate rates to the level of the interstate rates found by the Interstate Commerce Commission to be just and reasonable and fixed and prescribed in Texas Lines Tariff 2B; that said rights, privileges, and immunities of the defendants herein exist under the Constitution and laws of the United States, and especially under the commerce clause of the Constitution of the United States and the act of the Congress of February 4, 1887, commonly known as the 'Interstate Commerce Act and Amendments Thereto,' and said rights, privileges, and immunities were especially set up and claimed in defendants' answer, and the same were denied, refused, and disallowed by this court, and this was error.

"Sixth. The court erred in granting the temporary injunction prayed for in this cause, because the defendants are required by the decision and order of the Interstate Commerce Commission of July 7, 1916, to charge the same rates for the transportation of property between the points in Texas as is contemporaneously applied for the movement of property between Shreveport, La., and points in Texas. The rates named in Texas Lines Tariff 2B for the transportation of property between Shreveport, La., and points in Texas are the same rates found by the Interstate Commerce Commission in its said order and decision to be just and reasonable, and the rates named in said Texas Lines Tariff 2B for transportation between points in Texas on like property and for like distances are the same as those prescribed in said tariff for the movement of property from Shreveport, La., to points in Texas. The defendants are required by the said order of the Interstate Commerce Commission to charge the same rates for moving property between. Shreveport, La., and points in Texas, as are contemporaneously charged for the movement of like property for like distances between points in Texas, except where the rate is influenced by water competition as hereinbefore stated. They are entitled to charge the rates found to be just and reasonable by the Interstate Commerce Commission for the movement of property between Shreveport, La., and points in Texas, and have the right under the Constitution and laws of the United States to remove the discrimination found to exist against Shreveport, La., by elevating the Texas intrastate rates to the level of the interstate rates named in said Texas Lines Tariff 2B and found to be reasonable by the decision of the Interstate Commerce Commission. Defendants are not only bound, under heavy penalties, but they have the right and privilege under the Constitution and laws of the United States, to charge the rates named in Texas Lines Tariff 2B for the transportation of property between Shreveport, La., and points in Texas, and for the transportation of like property for like distances between points in Texas. The court erred in denying them this right, in granting the temporary writ of injunction in this cause, thereby suspending and restraining the operation of said order of the Interstate Commerce Commission of July 7, 1916."

Under these assignments learned counsel for appellants have submitted and argued the following propositions:

"First. Congress, in the exercise of its power, may prevent the common instrumentalities of interstate and intrastate traffic from being used in intrastate operations to the injury of interstate commerce.

"Second. Congress has the power to control the intrastate rates maintained by carriers under state authority to the extent necessary to remove the resulting unjust discrimination against interstate commerce arising out of the relation between the intrastate rates and interstate rates which are reasonable in themselves.

"Third. Congress may delegate to the Interstate Commerce Commission authority to control the intrastate rates maintained by a carrier under state authority to the extent necessary to remove the resulting unjust discrimination against interstate commerce arising out of the relation between such intrastate rates and interstate rates which are reasonable in themselves.

"Fourth. The authority of the Interstate Commerce Commission to remove the discrimination against interstate traffic under the act of February 4, 1887, and amendment thereto, includes the power to control the intrastate rates maintained by a carrier under state authority to the extent necessary to remove the resulting unjust discrimination against interstate commerce arising out of the relation between such intrastate rates and interstate rates which are reasonable in themselves, notwithstanding the proviso in section 1 of that act that its provisions shall not apply to purely interstate traffic.

"Fifth. The rates named in Texas Lines Tariff 2B for transportation of property between Shreveport and points in Texas are the maximum rates found by the Interstate Commerce Commission to be just and reasonable; and the railroads have the right to apply such rates, and they are at liberty to comply with the commission's requirements by increasing these intrastate rates sufficiently to remove the forbidden discrimination. So far as the interstate rates named in Texas Lines Tariff 2B conform to what was found to be reasonable by the Interstate Commerce Commission, the carriers are entitled to maintain them, and they are free to comply with the order by so adjusting other rates to which the order relates as to remove the forbidden discrimination.

"Sixth. The Interstate Commerce Commission had the power and authority to promulgate the opinion and issue its order of July 7, 1916, and to fix just and reasonable maximum freight rates from Shreveport to points in Texas and to require the appellants and the other railroads in Texas to remove the discrimination found to exist against Shreveport; and the appellants and other railroads in Texas had and have the right to fix the maximum rates found by the Interstate Commerce Commission to be reasonable for the movement of traffic from Shreveport to points in Texas, and to remove the discrimination by elevating the intrastate rates to the level of the interstate rates found by the Interstate Commerce Commission to be just and reasonable, which was and is done in Texas Lines Tariff 2B, filed with the Interstate Commerce Commission more than 30 days prior to November 1, 1916, and the district court of Travis county erred in denying appellants that right."

Neither the state of Texas nor the Texas Railroad Commission was a party to that proceeding, and, conceding the facts to be as stated, are all of the propositions of law asserted by appellants sound and correct? These propositions may be differently stated in the form of two questions, which are: First. Does the provision of the federal Constitution conferring upon Congress the power to regulate interstate commerce vest in that body the power to regulate and control intrastate traffic for the purpose of preventing a common carrier engaged in interstate commerce from unjustly discriminating between persons or places, when such discrimination does not result from anything done in transportation of interstate commerce, but solely from something done by such interstate carrier in transportation of intrastate traffic? Second. If such power has been vested in the federal Congress, has that body delegated the same to the Interstate Commerce Commission? Both of these questions are of profound importance to the American people; but if a negative answer should be given to the second, a decision of the first is not necessary in this case, and therefore we shall now address ourselves to the consideration of the second question.

[3] In so far as this case is concerned, the powers of the Interstate Commerce Commission are fixed and limited by act of Congress of February 4, 1887; the pertinent portions thereof reading as follows:

"Section 1. That the provisions of this act shall apply to any common carrier or carriers engaged in the transportation of passengers or property wholly by railroad, or partly by railroad and partly by water when both are used, under a common control, management, or arrangement, for a continuous carriage or shipment, from one state or territory of the United States, or the District of Columbia, to any other state or territory of the United States, or the District of Columbia, or from any place in the United States to an adjacent foreign country, or from any place in the United States through a foreign country to any other place in the United States, and also to the transportation in like manner of property shipped from any place in the United States to a foreign country and carried from such place to a port of transshipment, or shipped from a foreign country to any place in the United States and carried to such place from a port of entry either in the United States or an adjacent foreign country: Provided, however, that the provisions of this act shall not apply to the transportation of passengers or property, or to the receiving, delivering, storage, or handling of property, wholly within one state, and not shipped to or from a foreign country from or to any state or territory as aforesaid.

"The term 'railroad' as used in this act shall include all bridges and ferries used or operated in connection with any railroad, and also all the road in use by any corporation operating a railroad, whether owned or operated under a contract, agreement, or lease; and the term 'transportation' shall include all instrumentalities of shipment or carriage.

"All charges made for any service rendered or to be rendered in the transportation of passengers or property as aforesaid, or in connection therewith, or for the receiving, delivering, storage, or handling of such property, shall be reasonable and just; and every unjust and unreasonable charge for such service is prohibited and declared to be unlawful."

24 Stat. 379.

"Sec. 3. That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

"Every common carrier subject to the provisions of this act shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers and property to and from their several lines and those connecting therewith, and shall not discriminate in their rates and charges between such connecting lines; but this shall not be construed as requiring any such common carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business."

U. S. Comp. St. 1916, § 8565.

By other sections of that statute the Interstate Commerce Commission is created with power to perform many duties for the purpose of enforcing the act, including power to determine reasonable rates for interstate traffic, and to compel railroads engaged in such traffic not to charge and collect rates in excess of those so determined to be reasonable, and not to unjustly discriminate against persons or places. The overshadowing and far-reaching question in this case is: Does that act clothe the Interstate Commerce Commission with power and authority to control, or in any manner interfere with, railroad rates for purely intrastate traffic, under any circumstances or for any purpose, or was it the purpose of Congress, in placing the limitation which is contained in the proviso, to withhold such power from the Interstate Commerce Commission? It is contended on behalf of appellants that the proviso referred to was enacted solely for the purpose of rendering it certain that it was not the intention of Congress to confer upon the Interstate Commerce Commission authority to control or regulate intrastate traffic generally, and that it should not be construed as denying to that commission power to deal with and control intrastate rates by railroads engaged in interstate commerce, when such rates have a direct and injurious effect upon such commerce.

The latter construction seems to find support in the decision of the Supreme Court of the United States in H. E. & W. T. Ry. Co. v. United States, 234 U. S. 342, 34 Sup. Ct. 833, 58 L. Ed. 1341, commonly known as the "Shreveport Rate Cases." But this court is so clearly convinced of the correctness of the opposite view that it joins the Supreme Court of South Dakota in respectfully declining to follow that case until that great tribunal has reconsidered and reaffirmed the doctrine there announced. Some

of the reasons for that conclusion will here be stated, and others will be disclosed by excerpts from the opinion of the South Dakota court, which will be hereafter set forth.

In the first place, the manner in which the Shreveport Rate Cases reached the Supreme Court, and the circumstances under which that tribunal considered and decided those cases are, we think, worthy of note. The Railroad Commission of the state of Louisiana instituted a proceeding before the Interstate Commerce Commission, which resulted in that body making the order now relied upon by appellants in this case, as authorizing them to increase many of their intrastate rates in Texas. That proceeding was brought against the Texas & Pacific Railway Company, Houston East & West Texas Railway Company, and Houston & Shreveport Railway Company, and perhaps other carriers, but neither the state of Texas, the Railroad Commission of Texas, nor the Attorney General of Texas were made parties to that proceeding. While the commission found that the three railways referred to were unjustly discriminating against Shreveport, in the state of Louisiana, on account of rates charged by such carriers upon certain intrastate traffic, and while it made an order requiring such carriers to remove such discrimination, it held that such removal could be accomplished by the carriers increasing the intrastate rates referred to, three members of that body dissenting. Thus it will be seen that, while the decision of the Interstate Commerce Commission was in favor of Shreveport upon its complaint, it was also highly beneficial to the Texas railroads that were parties to that proceeding, because it held that they were entitled to largely increase many of their intrastate rates, which would not only relieve them from any hardship in granting the relief awarded to Shreveport, but would increase their revenues many thousands of dollars. Nevertheless the carriers referred to appealed that proceeding to what was then known as the Commerce Court, where the order of the Interstate Commerce Commission was sustained, and the carriers then prosecuted an appeal to the Supreme Court of the United States.

While it is true that the record in that case, as disclosed by the official report, shows that the appealing carriers presented to that court for decision the questions discussed and decided in the opinion of the court, it is nevertheless reasonably certain that the litigants who appeared as complainants in that tribunal did not in fact desire to have the decision of the Interstate Commerce Commission set aside, and therefore it is not unreasonable to suppose that the able counsel who represented the appellants in that case did not urge the contentions which the record shows they made with as much zeal and ability as otherwise they would have done. These remarks are not intended as a criti-

cism of the distinguished counsel referred to, nor as any reflection upon the Supreme Court. But it is a matter of common knowledge that such valuable properties as railroads are controlled and managed by men possessed of a high order of intelligence and business acumen; and it is contrary to reason to suppose that such men, advised by able attorneys, would desire to have a decision overruled which, if enforced, would place no burden upon the property controlled by them, but would result in vastly increasing their revenues; and therefore we feel justified in saying that, while the carriers referred to prosecuted the appeal through all of its stages from the Interstate Commerce Commission to the Supreme Court, that appeal was not prosecuted for the purpose of nor with a desire to have it sustained. Nor is it difficult to surmise the purpose for which it was prosecuted. Neither the state of Texas, its Railroad Commission, nor its Attorney General were parties to the proceeding referred to, and were therefore at liberty to contest in a judicial proceeding the validity of that order of the Interstate Commerce Commission, and doubtless the legal advisers of the carriers deemed it the part of wisdom to buttress the decision of the commission with a decision of the Supreme Court of the United States approving the action of the commission, and the appeal which they prosecuted accomplished that result.

The litigants who prosecuted that appeal are now invoking the decision of the Supreme Court rendered therein as justifying them in disregarding the orders of the Railroad Commission of Texas, and in raising their intrastate rates higher than those permitted by the latter body. So it seems reasonably certain that the Shreveport Rate Cases were decided by the Supreme Court in accordance with the desires of all the parties to that litigation; and when such a decision is rendered by any appellate court, it seems to us that the circumstances under which it is rendered are calculated to militate against its standing as authority. As said before, these remarks are not intended as a reflection upon any one connected with that case.

Turning now to the proviso contained in the first section of the Interstate Commerce Act, it seems clear to us that, when fundamental rules of construction and the acid test of reason are applied to its clear and unambiguous language, no room can be found for an interpretation of it which will justify the contention of the carriers and the ruling made in the Shreveport Rate Cases to the effect that the inhibition contained in the proviso should be limited to domestic commerce and intrastate traffic when considered alone as such, and not as embracing intrastate traffic in connection with and relation to interstate traffic. The language of the proviso is as broad as it could well have been made, and by its own terms it ap-

plies to and constitutes a limitation upon every section of the act of which it is a part.

In its opinion the Supreme Court seems to lay great stress upon section 3, hereinabove set out, and, after copying part of it in the opinion, the court says:

"This language is certainly sweeping enough to embrace all the discriminations of the sort described, which it was within the power of Congress to condemn. There is no exception or qualification with respect to an unreasonable discrimination against interstate traffic produced by the relation of intrastate to interstate rates as maintained by the carrier."

With all due respect to the court, it seems to us that it overlooked the fact that by its very terms the proviso incorporated in section 1 is made a part of section 3, and that in construing the portion thereof quoted by the Supreme Court it should be considered as if it read as follows:

"Sec. 3. That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever: Provided, however, that the provisions of this section shall not apply to the transportation of passengers or property, or to the receiving, delivering, storage, or handling of property wholly within one state and not shipped to or from a foreign country from or to another state or territory, as aforesaid.

So it seems to us that, when that section is considered in its entirety, including the proviso, which Congress has declared shall constitute a part of it, its language is not sweeping enough to embrace all the discriminations which the court there held to be within the power of Congress to condemn, and that that section, when properly construed does contain an exception which includes every phase of intrastate commerce. That exception results from the fact that Congress in enacting the proviso distinctly declared that the provisions of the act, including section 3, shall not apply to intrastate traffic, and did not except any character or kind of such traffic. Congress did not limit that inhibition to such traffic when considered separate and apart from other traffic, but declared in plain and simple language, in substance, that none of the provisions of that act should apply to the traffic therein described, which was, in substance, all transportation of passengers or property, and all receiving, delivering, storage, or handling of property wholly within one state, and not shipped to or from a foreign country, or from or to any state or territory of the United States. The language of the inhibition contained in the proviso is free from ambiguity, is broad enough to, and according to its plain import does, include every character of domestic commerce or intrastate traffic, and the fact that to so construe it may result in con-

fusion and place a limitation upon the powers of the Interstate Commerce Commission which may curtail the efficiency of that body can afford no justification for a departure from the well-established canons of construction.

[4] In the construction of statutory law courts are limited to the ascertainment of the legislative intent, and when the language of the statute is plain, and the meaning not utterly unreasonable or absurd, they do not concern themselves with the wisdom or lack of wisdom of the law. The proposition that the proviso in the statute under consideration was placed there for the purpose of preventing the Interstate Commerce Commission from claiming jurisdiction over intrastate traffic generally and without reference to its relation to interstate traffic finds little support in reason and less in the language of the proviso. If that provision had been left out, there is no probability that the Interstate Commerce Commission, or the railroads, would have put forth the contention that the statute had any such far-reaching effect, and was intended to apply generally to intrastate as well as interstate traffic. But if the inhibition contained in the proviso had not been incorporated in the statute, some room might have been left for the contention which has been and is now made, to the effect that, when intrastate rates charged by a carrier engaged in interstate commerce have relation to each other, the statute applies, and the Interstate Commerce Commission has the power to deal with both; and it is entirely reasonable to suppose that the proviso was placed in the statute for the purpose of preventing just such contentions.

In the recent case of State of South Dakota et al. v. American Express Co. et al., 161 N. W. 132, decided by the Supreme Court of that state January 20, 1917, that court dealt with the question now under consideration in a manner so able, logical, and convincing that we make the following excerpts from its opinion:

"Defendants contend that the commission has authority to regulate and control intrastate rates, in so far as such regulation and control may be necessary in order to prevent unjust discrimination resulting from inequalities between such rates and interstate rates. In support of the above contention defendants cite the decision of the federal Supreme Court (hereinafter spoken of as the 'Supreme Court') in the so-called Shreveport Case, 234 U. S. 342 [34 Sup. Ct. 833] 58 L. Ed. 1341. Plaintiffs contend that the law applicable to the facts of this case was announced by the Supreme Court in Minnesota Rate Cases (hereinafter spoken of as the Minnesota Case) 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151 [Ann. Cas. 1916A, 18], and that the order of the commission, if subject to the construction given it by defendants, is invalid, in that the commission was without authority over the subject-matter thereof.

"All controversy as to the authority of the commission to control intrastate rates in order to remove discrimination resolves itself down to a dispute as to the scope and effect of certain

provisions of the Interstate Commerce Act, and, when we arrive at the proper construction of such provisions, we must of necessity reach the proper determination of the existence or non-existence of such authority. There are certain propositions so axiomatic that they must be presumed to have been in the minds of Congress when enacting such act. Any discrimination that may exist, either against carriers, shippers, or consumers, arising solely from the charging of rates that are reasonable, cannot be removed by a change of rates without there result an unjust discrimination against either the carrier, the shipper, or consumer. Behind unjust discrimination there always exists unreasonable—that is, unjust and unfair—rates; therefore the sole remedy for unjust discrimination lies in the establishment of reasonable rates. Unreasonable rates being the cause and unjust discrimination the effect, the authority to remove unjust discrimination is to be measured by the authority to prescribe reasonable rates. Every appeal to a commission seeking the termination of discrimination is, in effect, a prayer for the establishment of reasonable rates. Such an appeal cannot be effective unless made to those having authority to prescribe rates. If, under its power to regulate interstate commerce, Congress can and does even indirectly fix the rates to be charged for intrastate commerce, even though such control professes to be limited in its territorial application, it must from the very necessities of commercial intercourse and competition result in a conformity of all intrastate rates to those thus prescribed. In other words, there is no such thing as a limited regulation by Congress of the charges for intrastate commerce; wherever Congress steps in, the free action of the local authorities is throttled, as they must of necessity eliminate discrimination, and can only do so by conforming all rates to those prescribed by the dominant power. Congress, by the specific provisions of section 1 of the said act, has declared it shall be unlawful for carriers to make, and it has prohibited them from making, unjust and unreasonable charges 'for any service rendered or to be rendered in the transportation of * * * property * * * as aforesaid.' The preceding provision of said section, to which the word 'aforesaid' refers, clearly shows that the 'transportation' contemplated is solely such as is purely interstate. This, it would seem, was made doubly certain by the proviso contained in the first paragraph of such section, which proviso is hereinafter quoted, and which proviso expressly refers to, and, it seems to us, clearly limits, every provision of the whole act. Certainly it cannot be presumed that Congress intended that the authority given the commission under section 15 of such act [U. S. Comp. St. 1916, § 8583] to enforce the provisions of section 3 thereof, and thus prevent unjust discriminations, was intended to extend beyond and to be inconsistent with the corresponding authority, given to such commission by sections 1 and 15, to remove the cause of such discrimination. As throwing further light upon the intent of Congress in enacting such act, it is well to note the situation at the time of such enactment. At that time it was fully settled by judicial decisions: (1) That the actual regulation of interstate commerce by Congress excluded state regulation thereof; (2) that the power to regulate internal commerce rests exclusively with the states; (3) that in matters pertaining to commerce, which matters are essentially national in their character, and, for that reason, requiring national uniformity in regulation, failure of Congress to act does not allow of state control, while in matters local in character though affecting interstate commerce the power of the state is complete and unrestricted in absence of congressional action. Up to that time whatever attempt had been made to establish or regulate rates for transportation of either passengers or freight or to prevent discrimination in rate charges had been the work of the several states. The right of the states to legislate, so far as their legislation pertained to intrastate commerce, had been fully recognized by the federal courts. We know of no case, and we believe none can be cited, wherein the Supreme Court had, up to that time, held that, under the commerce clause of the federal Constitution, the power of Congress extended even to the indirect control of intrastate rates. It is, true that in numerous decisions the federal control over the instrumentalities of commerce had been held to extend to instrumentalities having a situs local to a state if the same were used in connection with interstate commerce. But as has been well said: 'It may be asked, why may not Congress regulate intrastate rates, if it may require, as the Supreme Court has decided, the use of safety appliances on purely intrastate trains? The reason is that, while interstate and intrastate rates may be interdependent for economic or geographical reasons, this is not the same direct interdependence that necessarily exists between trains or cars operated over the same tracks. A rate is a charge for, not an instrument of, transportation.'

"By the act in question Congress embarked into a new field of action. It enacted certain provisions declaring the policy that should govern those engaged in interstate commerce. It knew and fully recognized that it could not act directly in the fixing and adjusting of rates; that it could only exercise such power through the medium of some administrative body. But the Supreme Court concedes that Congress did not give to such administrative agency the power to directly regulate rates for intrastate traffic—a power upon which, as we have noted, should properly rest the power to remove discrimination where such discrimination can only be removed by a change in intrastate rates. The Supreme Court, in the Shreveport Case, says that Congress 'did not undertake to authorize the commission to prescribe intrastate rates, and then to establish a unified control by the exercise of the rate-making power over both descriptions of traffic.' We do not believe sound logic will permit the conclusion that, while Congress did not authorize the commission to directly prescribe intrastate rates, and thus establish a unified control over both interstate and intrastate rates, that it did intend to give it the power, under the guise of preventing unjust discriminations, to exercise exactly the same control. When we contemplate the inevitable result of giving to the commission a dominant power over intrastate rates in even a limited territory, we must recognize that through the exercise of such power it must exert an indirect influence absolutely controlling the intrastate rates throughout that state. Therefore, in view of all the above, we do not believe that Congress intended to exert any other than the power which at that time was conceded by all to have been given to it by the Constitution; and, with all due respect to the Supreme Court, we are constrained to differ from it and hold that the proviso in section 1 of said act has the effect, just as it purports, of limiting 'the provisions of this act,' so that no provision, whether it be one found in section 3 or elsewhere, 'shall apply to the transportation of passengers or property * * * wholly within one state. * * *' We think any other construction does violence to the plain wording of such proviso.

"The point upon which the Supreme Court, in the Shreveport Case, distinguished that from the Minnesota Case, was that, in the Minnesota Case Congress had not acted; that is, the commission, through which Congress had undertaken to exert its power, had not made any finding of unjust discrimination and adjudged how it should be eliminated. Keeping in mind that in the Shreveport Case the court, when speaking of the failure of Congress to act, had ref-

erence to such failure of the commission, the agent of Congress, to act, we find much of the apparent conflict between the two opinions disappears. But there yet remains that which we are unable to reconcile, and which leads us to feel that the Supreme Court went further in the Shreveport Case than precedent or any reasonable construction of the federal statute warrants. We shall not refer further to that part of the opinion in the Minnesota Case wherein the court discusses certain principles the application of which supports the right of Congress to control the instrumentalities of intrastate commerce, and then says: 'These principles apply to the authority of the state to prescribe reasonable maximum rates for intrastate transportation.'

"Upon the above proposition taken as a premise the court reaches the conclusion that, through the medium of the commission, Congress has undertaken to exercise a regulatory power or control over the state's authority to prescribe maximum intrastate rates. Even if we were to concede the premise, we do not believe the conclusion follows, but do believe that Congress has expressly refused to exercise any such control.

"The proviso in section 1 of the Interstate Commerce Act reads: 'Provided, however, that the provisions of this act shall not apply to the transportation of passengers or property, or to the receiving, delivering, storage, or handling of property, wholly within one state, and not shipped to or from a foreign country, from or to any state or territory as aforesaid.' It was this proviso which was in the mind of the Supreme Court when, in the Minnesota Case, it said (the underscoring being ours):

" 'The question we have now before us, essentially is whether, after the passage of the Interstate Commerce Act, and its amendment, *the state continued to possess the state-wide* authority which it formerly enjoyed *to prescribe reasonable rates for its exclusively internal traffic.* * * *

" 'Having regard to the terms of the federal statute, the familiar range of state action at the time it was enacted, the continued exercise of state authority in the same manner and to the same extent after its enactment, *and the decisions of this court recognizing and upholding this authority, we find no foundation for the proposition that the act to regulate* commerce contemplated interference therewith.

" '*Congress did not undertake to say that the intrastate rates of interstate carriers should be reasonable, or to invest its administrative agency with authority to determine their reasonableness.* Neither by the original act nor by its amendment did Congress seek to establish a unified control over interstate and intrastate rates; *it did not set up a standard for intrastate rates, or prescribe or authorize the commission to prescribe, either maximum or minimum rates for intrastate traffic.* It cannot be supposed that Congress sought to accomplish by indirection that which it expressly disclaimed, or attempted to override the accustomed authority of the states without the provision of a substitute. On the contrary, *the fixing of reasonable rates for intrastate transportation was left where it had been found; that is,* with the states and the agencies created by the states to deal with that subject. Missouri, P. R. Co. v. Larabee Flour Mills Co., 211 U. S. 612, 620, 621, 29 Sup. Ct. 214, 53 L. Ed. 352, 359, 360.

" 'How clear was the purpose not to occupy the field thus left to the exercise of state power is shown by the clause uniformily inserted in the numerous acts passed by Congress to authorize the construction of railways across the Indian Territory. * * * The decisions of this court since the passage of the act to regulate commerce have uniformly recognized that it was competent for the state to fix such rates, applicable throughout its territory. If

it be said that in the contests that have been waged over state laws during the past 25 years the question of interference with interstate commerce by the establishment of state-wide rates for intrastate traffic has seldom been raised, this fact itself attests the common conception of the scope of state authority. And the decisions recognizing and defining state power *wholly refute the contention that the making of such rates either constitutes a direct burden upon the* interstate commerce or is repugnant to the federal statute.'

"Would it have been possible for such court to have used language by which it could have more clearly or specifically denied that Congress had asserted any right to extend federal authority over the field of intrastate commerce? And the above words were used more than a year after the commission made its report in the Shreveport Case and subsequent to the date of the decision of the Commerce Court in such case.

"In the Shreveport Case, just as in the case before us, the question before the court was the right of the carrier to end an existing discrimination, arising through the existence of interstate rates that were higher than intrastate rates, by raising the intrastate rates. The rates under consideration in that case were 'commodity' rates, while in this case they are 'class' rates; but that fact is entirely immaterial. In that case, the Supreme Court said (the underscoring being ours): 'Here the commission expressly found that unjust discrimination existed under substantially similar conditions of transportation, and the inquiry is whether the commission had power to correct it. *We are of the opinion that the limitation of the proviso in section 1 does not apply to a case of this sort.* The commission was dealing with the relation of rates injuriously affecting, through an unreasonable discrimination, traffic that was interstate. The question was thus not simply one of transportation that was "wholly within one state." These *words of the proviso have appropriate reference to exclusively intrastate traffic, separately considered; to the regulation of domestic commerce, as such.* The powers conferred by the act are not thereby limited where interstate commerce itself is involved. This is plainly the case when the commission finds that unjust discrimination against interstate trade arises from the relation of intrastate to interstate rates as maintained by a carrier subject to the act. Such a matter is one with which Congress alone is competent to deal, and, in view of the aim of the act and the comprehensive terms of the provisions against unjust discrimination, there is no ground for holding that the authority of Congress was unexercised, and that the subject was thus left without governmental regulation. It is urged that the practical construction of the statute has been the other way. But, in assailing the order, the appellants ask us to override the construction which has been given to the statute by the authority charged with its execution, and it cannot be said that the earlier action of the commission was of such a controlling character as to preclude it from giving effect to the law. The commission, having before it a plain case of unreasonable discrimination on the part of interstate carriers against interstate trade, carefully examined the question of its authority, and decided that it had the power to make this remedial order. The Commerce Court sustained the authority of the commission, and it is clear that we should not reverse the decree unless the law has been misapplied. This we cannot say; on the contrary, we are convinced that the authority of the commission was adequate.'

"We confess our inability to harmonize the parts underscored with what we have quoted from the opinion in the Minnesota Case. At one fell swoop the Supreme Court, if it shall not withdraw in some degree from the above, has absolutely destroyed the power of the states to prescribe maximum rates for intrastate traffic.

It is idle to say that it would have power over all rates except those dictated by the commission. As before noted, the prevention of discrimination would require it to conform its rates to those prescribed by the dominant power. We are not questioning but that it may be the part of wisdom for the states to give to the federal government such power, or, if it has already given it, then for Congress to so amend its enactments as to assume the exercise of such power; but it seems to us that the question of expediency has no proper place in the discussion of either the power possessed by Congress or the power exercised by that body. We are inclined to believe that the Supreme Court may have unconsciously been influenced by the fact that 'the relation of intrastate to interstate rates' is '* * * a matter * * * with which Congress alone is competent to deal.' We cannot believe that, because the commission had 'carefully examined the question of its authority and decided that it had the power to make this remedial order,' the Supreme Court should have felt in any manner constrained to follow such holding. On the contrary, if there is any one thing established by experience, it is that courts should look with the utmost suspicion upon the holding of any person or body as to its own authority; they are prone to reach out and assume to themselves authority never intended to be granted them. We cannot refrain from quoting the following words of the Supreme Court in the Minnesota Case (the underscoring being ours): 'If the situation has become such * * * that adequate regulation of * * * interstate rates cannot be maintained without imposing requirements with respect to * * * intrastate rates which substantially affect the former, *it is for Congress to determine, within the limits of its constitutional authority over interstate commerce and its instruments, the measure of the regulation it should supply. It is the function of this court to interpret and apply the law already enacted, but not, under the guise of construction, to provide a more comprehensive scheme of regulation than Congress had decided upon.'*

"While we are of the opinion that the language of the act to regulate commerce is so clear as to admit of little doubt of the legislative intent, and that therefore the question of expediency is entitled to little or no consideration, yet, in view of the fact that the Supreme Court, in the Shreveport Case, advances the thought that 'Congress alone is competent to deal' with 'the relation of intrastate and interstate rates,' we feel justified in suggesting that there is another power that can be relied upon to prevent injustice. The federal courts, through their power to set aside rates unjust to the interstate carrier, have full control over the only thing that will ever result in *unjust* discrimination as between interstate and intrastate traffic—the fixing by the commission or the board of a rate that is unjust to the carrier. As before stated, unreasonable rates are the sole cause of unjust *discrimination.* The reasonableness, as intrastate rates, of the rates established by the board, is unquestioned; it must stand absolutely conceded for the purposes of this case as it had to be conceded before the commission. The commission had no power to pass on that question. * * * The intrastate rates being conceded to be reasonable as intrastate rates, there can be no *unjust* discrimination traceable thereto. If the intrastate rates were unreasonable, the law provides no relief therefrom except before the board or in the courts. We believe that Congress fully realized the impropriety, even if it had the power so to do, of placing in the hands of a federal commission the authority to pass upon the reasonableness of intrastate rates as such, and that it intentionally withheld such power from the commission. * * *

"We feel confident that, upon further consideration of these most important questions, the Su-

preme Court will recede, if not from the position it took in the Minnesota Case in regard to the extent of the federal authority over interstate commerce, at least from the position it took in the Shreveport Case in regard to the proper construction to be given to the act to regulate commerce. Moved by such confidence, we deem it our duty to hold the order of the commission, if subject to the construction given it by defendant, to be absolutely void owing to lack of authority in the commission to make any such an order. If, however, this case shall reach the Supreme Court, and it shall adhere to its decisions in the Minnesota and Shreveport Cases, we shall cheerfully bow to its supreme authority and abide thereby."

The views of the Supreme Court of South Dakota so ably expressed in the foregoing excerpts meet with the hearty approval of this court. All of the questions so ably presented in this case by counsel for the respective litigants have received the consideration demanded by their importance, and our conclusion is that the judgment appealed from should be affirmed; and it is so ordered.

Affirmed.

### On Motion for Rehearing.

In deciding this case this court held that the Congress had not vested in the Interstate Commerce Commission the power to regulate or otherwise interfere with purely intrastate rates of traffic; and therefore it was held that the order of that commission afforded no justification to appellants for increasing such rates beyond those prescribed by the Railroad Commission of Texas.

In making that decision this court followed the South Dakota case referred to in our original opinion. That case was carried to the Supreme Court of the United States, and that court has entered its decision, holding: First, that the Interstate Commerce Commission has the power to require railroads engaged in interstate commerce to pursue whatever course may be necessary to remove unjust discrimination as to interstate rates, although to accomplish that purpose it may be necessary to change intrastate rates as fixed by a state; second, to the extent that the order in that case accomplished that purpose, it must dominate and control; third, that the Interstate Commerce Commission was without power to regulate or interfere with intrastate rates that had no bearing upon the question of unjust discrimination as against interstate rates; and, fourth, that the Dakota case was not a proceeding exclusively to enjoin, set aside, annul, or suspend an order of the Interstate Commerce Commission, because some of the rates there involved did not come within the scope of, and therefore were not protected by, the order of the Interstate Commerce Commission.

Applying the law thus announced to the proceeding at bar, which is an appeal from an interlocutory order restraining the appellants from putting into effect certain rates affecting numerous railroads located in various portions of the state, and without dis-

cussion or elaboration, we announce our conclusions as follows:

(1) The state court from which this appel is taken had jurisdiction, because, as to some of the railroads and some of the rates, there was no competition as to interstate commerce moving to or from Shreveport, La.; also it is charged in the state's petition that the defendants had entered into a conspiracy by which they had agreed to fix rates, tariffs, and charges in violation of the state antitrust statute. These allegations and facts conferred jurisdiction upon the state court.

(2) The facts, as disclosed by the testimony, and the judicial knowledge of the court, justified the issuance of the temporary restraining order for the purpose of preserving the status quo until the case was finally tried; and therefore the judgment of affirmance is correct, and the motion for rehearing is overruled.

On Second Petition for Rehearing.

Appellants have been permitted to file a second motion for rehearing, in order that this court might consider new matter set up therein. The new matter referred to consists of an affidavit to the effect that since this case was first decided by this court the President of the United States has appointed a Director General of all the railroads in the United States, including appellants, and that, after taking possession of such roads, and on December 29, 1917, the Director General issued an order, one paragraph of which reads as follows:

"7. Existing schedules of rates and outstanding orders of the Interstate Commerce Commission are to be observed, but any such schedules of rates or orders as may hereafter be found to conflict with the purposes of said proclamation or with this order shall be brought immediately by wire to the attention of the Director."

It is contended on behalf of appellants that under this order they are required by the Director General of railroads to obey the order of the Interstate Commerce Commission issued July 7, 1916, and that the preliminary injunction from which this appeal is prosecuted prohibits them from doing so. It is further contended that the order of the Director General is supreme and superior to the order of the district court of Travis county, and therefore this court should reverse that order, and leave appellants free to comply with the order of the Director General.

[5] We are of the opinion that, as presented to this court at this time, we have no jurisdiction to pass upon that question. Articles 4644 and 4645 of the Revised Statutes of this state authorize and regulate appeals from orders granting, refusing, or dissolving temporary writs of injunction, and prescribe that such appeals may be heard in the Courts of Civil Appeals, or Supreme Court, "on the bill and answer, and such affidavits and evidence as may have been admitted by the judge granting, refusing, or dissolving such injunction." We think the language quoted limits the power and jurisdiction of this court to a consideration of the questions presented by the bill and answer and such evidence as may have been heard by the trial judge, and that this court has no jurisdiction to hear and consider anything else.

[6] The action of this court in affirming the action of the trial judge in granting the temporary injunction does not preclude the district court, or the judge thereof, from consideration of another motion to dissolve the injunction, and if appellants are entitled to the relief they now ask at the hands of this court, we take it for granted they can obtain that relief in the court below.

Motion overruled.